[907 NYS2d 833]

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v CONSTANTINE CRISTACHE, Defendant.

Criminal Court of the City of New York, Queens County, September 13, 2010

## APPEARANCES OF COUNSEL

*Zamir Iosepovici* for defendant. *Richard A. Brown, District Attorney* (*Daniel Bresnahan* of counsel), for plaintiff.

## OPINION OF THE COURT

JOSEPH A. ZAYAS, J.

Defendant moves pursuant to Criminal Procedure Law § 440.10 (1) (h) to vacate the judgments of conviction in six cases, arguing that his prior plea attorney failed to provide effective assistance of counsel during and prior to his guilty pleas in the Queens Misdemeanor Treatment Court (QMTC). Defendant, who is currently facing removal proceedings initiated by the United States Department of Homeland Security, claims that he advised his plea attorney that he was not a citizen but a lawful permanent resident, and that his plea attorney failed to advise him regarding the immigration consequences of his guilty pleas. Defendant, who was required to complete drug treatment as a condition of his pleas, also alleges that had plea counsel correctly advised defendant regarding the immigration consequences of his pleas, he would not have pleaded guilty and would have proceeded to trial on his six cases.

Soon after defendant filed his motion, the United States Supreme Court decided *Padilla v Kentucky* (559 US —, 130 S Ct 1473 [2010]), which held that counsel for criminal defendants are constitutionally obligated to advise their noncitizen clients regarding the adverse immigration consequences of their guilty pleas.

Defendant's motion to vacate raises important questions regarding, inter alia, the scope of defense counsel's *Padilla*-imposed duty to provide immigration advice to noncitizen defendants charged with removable/deportable offenses, particularly where, as here, such defendants enter drug treatment in exchange for a promise that the underlying pleas would be

vacated and the charges dismissed.[1] The motion to vacate also raises important questions regarding the scope of the court's review in determining whether there is a reasonable probability that defendant would have insisted on going to trial had he been properly advised as to the immigration consequences of his guilty pleas.

### Defendant's Guilty Pleas in the Queens Misdemeanor Treatment Court

Defendant was arrested a total of six times over a nine-month period in 2009. Initially, defendant had three open cases referred to the QMTC. The charges in those cases included criminal possession of stolen property in the fifth degree (Penal Law § 165.40) (two counts), criminal possession of a controlled substance in the seventh degree (Penal Law § 220.03), assault in the third degree (Penal Law § 120.00), petit larceny (Penal Law § 155.25) and harassment in the second degree (Penal Law § 240.26). These cases were referred to the QMTC after the People offered a plea disposition which would have required defendant to plead guilty to an unspecified class A misdemeanor with a sentence of three years' probation on one case; an unspecified class B misdemeanor with a sentence of a conditional discharge and either five days of community service or a $250 fine on another case; and a violation, disorderly conduct (Penal Law § 240.20), with a sentence of a conditional discharge.

On July 27, 2010, defendant was assessed by a QMTC case manager, who, based upon defendant's heroin addiction and a 15-year history of drug abuse, recommended that defendant enter a drug detoxification unit and a 28-day drug rehabilitation unit, followed by a nine-month residential drug treatment program. Defendant indicated that he was in agreement with the treatment plan.

Defendant then pleaded guilty to criminal possession of stolen property in the fifth degree, criminal possession of a controlled substance in the seventh degree, and assault in the third degree. Pursuant to a written plea agreement, the court would vacate defendant's pleas and dismiss and seal each of the cases if defendant completed the drug treatment program. The plea agreement also provided that, should defendant fail to complete the program, the court would sentence defendant to four months'

---

1. This decision and order sets forth the court's expanded factual findings and legal conclusions and otherwise supplements the court's August 12, 2010 short order, denying the motion to vacate.

incarceration. During the plea allocution, defendant indicated that he understood the provisions of the plea agreement. The cases were adjourned for an update on defendant's progress in treatment.

A week after entering treatment, however, defendant absconded from his treatment program and the court issued a bench warrant. Although defendant subsequently entered several other detoxification programs in early August, he also absconded from each of them within days of entering. Later that same month, defendant was arrested once again, this time charged with criminal trespass in the third degree (Penal Law § 140.10). The defendant was remanded, and the new case and the three cases on which he had already pleaded guilty, along with another older open case (an unarraigned desk appearance ticket [DAT] charging criminal possession of a controlled substance in the seventh degree), came before the court.

Although defendant clearly violated the plea agreement by absconding from treatment, the court, after several adjournments, agreed to grant defendant another opportunity to complete treatment. Accordingly, defendant pleaded guilty to criminal possession of a controlled substance in the seventh degree on the DAT case and criminal trespass in the third degree on the newest arrest. Once again, pursuant to the plea agreement, the court would vacate defendant's pleas and dismiss and seal each of the cases should defendant complete the drug treatment programs. The plea agreement also provided, however, that should defendant fail to complete the program, this time the court would sentence defendant to two concurrent terms of 90 days' incarceration, consecutive to the four-month jail terms which defendant was facing on his earlier pleas.

Three days after the court released defendant from jail and sent defendant to a treatment program, he once again absconded from the program. The court issued another bench warrant. Two weeks later defendant was arrested, once again, and charged with criminal trespass in the third degree. Defendant was remanded, and the new case, along with the five cases on which defendant had already pleaded guilty, came before the court. Defendant admitted that he violated the terms of his plea agreements and the court imposed three concurrent four-month jail terms on defendant's first three cases, as well as two 90-day jail terms on defendant's fourth and fifth cases to run consecutively to the four-month terms. In addition, defendant pleaded guilty to criminal trespass in the third degree on the newest

case and was sentenced to 30 days' jail to run concurrent with the other cases.

## Defendant's CPL Article 440 Motion to Vacate, the People's Opposition and the Court's Interim Order

Two months after defendant was sentenced, defendant moved to vacate the judgments of conviction pursuant to Criminal Procedure Law § 440.10 (1) (h). Defendant also served several postmotion letters, apprising the court of the Supreme Court's decision in *Padilla v Kentucky* (559 US —, 130 S Ct 1473 [2010]),[2] and replying to the People's affirmation in opposition. Defendant essentially claims that although he notified his plea counsel that he was a lawful permanent resident, defendant's plea attorney failed to advise him regarding the immigration consequences of his guilty pleas—pleas to crimes which, according to defendant, subject defendant to removal from the United States.

The People opposed defendant's motion to vacate, principally arguing that defendant failed to establish, under the second prong of *Strickland*'s ineffective-assistance-of-counsel test (*Strickland v Washington*, 466 US 668 [1984]), that he was prejudiced by plea counsel's alleged failure to advise defendant of the immigration consequences of his guilty pleas.

The court issued an interim order on June 2, 2010, granting defendant's motion only to the extent of ordering a hearing (*see* CPL 440.30 [5]).

## The CPL Article 440 Hearing

The hearing was held on June 23, 2010. The defense called defendant's mother, Elizabeth Cristache, and defendant as wit-

---

**2.** Although several courts have disagreed regarding the retroactivity of *Padilla* (*compare People v Bennett*, 28 Misc 3d 575 [Crim Ct, Bronx County 2010], *and People v Garcia*, 29 Misc 3d 756, 762 [Sup Ct, Kings County 2010] [which hold that *Padilla* is to be retroactively applied], *with People v Kabre*, 29 Misc 3d 307 [Crim Ct, NY County 2010] [which holds that *Padilla* is not to be retroactively applied]), there is no question that *Padilla* applies to this case inasmuch as *Padilla* was decided while defendant's direct appeal was pending, only four months after defendant was sentenced. Under these circumstances, defendant's convictions were not "final" and therefore the retroactivity analysis does not apply (*Beard v Banks*, 542 US 406, 411 [2004] ["State convictions are final 'for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely petition has been finally denied' " (citations and internal quotation marks omitted)]).

nesses. Ms. Cristache testified that she entered the United States with her husband and her son as a Romanian refugee in 1989 and that she does not have any family, property or business connections in Romania. Ms. Cristache was diagnosed with colon and liver cancer in April 2009, which diagnosis she shared with defendant. At the time of the diagnosis, Ms. Cristache was advised by her physician that she had a three-year life expectancy.

Ms. Cristache further testified that just prior to defendant's initial plea on July 27, 2009, she was present when defendant notified his plea counsel outside of the QMTC courtroom that he was not a citizen and possessed a green card. Although Ms. Cristache admitted that she was not present during every conversation between defendant and his plea attorney, Ms. Cristache testified that plea counsel did not advise defendant regarding the immigration consequences of pleading guilty during this meeting on July 27 or other meetings at which she was present. At these meetings, Ms. Cristache urged defendant's plea attorney to get defendant into a drug treatment program because he needed "help." Ms. Cristache also urged her son to go into a drug program.

Defendant, Constantine Cristache, was also called as a witness on his own behalf. Defendant testified that he was born in 1977 in Romania and came to the United States with his mother as a refugee in 1989, and is now a lawful permanent resident, otherwise known as a "green card holder."[3] Defendant confirmed his mother's testimony that he has no home or family in Romania, and that he was aware that his mother was suffering from cancer as early as April 2009.

Defendant testified that on July 27, 2010, his defense attorney specifically asked him if he was a "citizen" and defendant informed her that he was not a citizen but was a "green card holder." During that conversation, counsel explained to defendant that if he completed the drug treatment program following his guilty plea, his "charges will be dismissed." Defendant insisted, however, that defense counsel never advised him— either on July 27, October 14, or November 25, the dates upon which defendant entered guilty pleas—of the immigration consequences of his guilty pleas or of his failure to complete the drug treatment program. He testified that he did not learn of

---

**3.** The Permanent Resident Card attached to defendant's CPL article 440 motion as exhibit B indicates that defendant has been a lawful permanent resident since "2/01/96."

such adverse immigration consequences until United States Immigration and Customs Enforcement (ICE) "picked [him] up" from Rikers Island in January 2010.

When defendant was specifically asked, on direct examination, "what [he] . . . would have done differently" if he were properly advised of the "negative immigration consequences" of his guilty pleas, defendant answered: "I would ask [defense counsel] to find a way, find a different plea bargain for me where I will not be in the position with immigration, I will not be in trouble with immigration, I will not be deported." When pressed further with the question of "what else . . . would [he] . . . have done" if the "plea bargain possibility did not exist," defendant responded that he "definitely would have t[aken] the [drug treatment programs] more seriously." Defendant also agreed that he "would have done things differently" had he been properly advised of the "negative consequences" arising from "pleading guilty."

The People continued this line of questioning on cross-examination and defendant continued to testify that had he been properly advised regarding the immigration consequences of his guilty pleas, he would have urged his plea attorney to get a more favorable plea and would have taken the drug treatment program more seriously. When the People then pointedly asked defendant whether he had previously testified that he "would have gone to trial" had he been properly advised regarding the possibility of deportation, defendant answered, "No." When the court then attempted to give defendant a chance to clarify his testimony, the following colloquy between the court and defendant ensued:

> "THE COURT: Are you saying that had [plea counsel] told you about the immigration consequences of your pleas, that you were subjecting yourself to deportation or removal proceedings, you would have pled guilty anyway; is that what you are saying, and then just taken the drug treatment part of the plea seriously?
>
> "DEFENDANT: The only reason I would have pled guilty, if I plead guilty to something where I would not be deportable.
>
> "THE COURT: Let's say that wasn't an option, you said then that you would then take your drug treatment more seriously?
>
> "DEFENDANT: If that will not be an option, yes."

When defendant's current attorney later asked defendant, on redirect examination, in a leading question which the court permitted over the People's objection, whether he would have pleaded guilty had he known that he "may be thrown out of this country and not being able to return here," defendant answered, "no I would not." Defendant never specifically asserted at any time during his testimony, however, that he would have insisted on going to trial had his attorney properly advised him of the adverse immigration consequences of his guilty pleas.

Defendant also testified that he was never contacted by ICE while he was in treatment or while he resided at home, and that ICE picked him up while he was serving his jail sentence which the court imposed only after he had repeatedly absconded from the drug treatment programs. Indeed, defendant admitted that he would not have been "in prison" had he completed his drug treatment programs and that his cases would have been dismissed. Defendant also candidly admitted that he had a drug problem, but testified that he was not aware that he was "deportable based solely on drug abuse."

The People called defendant's prior plea counsel as their only witness. Defense counsel, a Legal Aid Society criminal defense attorney, testified that she represented defendant on his six arrests in 2009 and learned early on in her representation—during the prearraignment interview after his first arrest—that defendant was a "green card holder." That fact was noted in two of plea counsel's files under a section entitled, "Immigration Status," including the file for defendant's first arrest, where plea counsel wrote, "green card, Romania."

Plea counsel testified that prior to defendant entering his first set of guilty pleas in July 2009, she advised defendant that if he failed to complete the drug treatment program, "he would have a criminal record, . . . he would face jail time, and he would have immigration consequences." Plea counsel candidly admitted, however, that she never indicated in her files that she provided the foregoing immigration advice, even though there was a box which she could have checked to memorialize the provision of such advice. Plea counsel also admitted that she failed to advise defendant regarding the immigration consequences of pleading guilty (as distinguished from providing advice regarding the immigration consequences of failing to complete treatment), even though she was aware that the subsequent vacatur and dismissal of the charges would not necessarily eliminate the possibility of deportation because the vacated guilty pleas would still be considered convictions for immigration purposes.

Plea counsel testified that defendant was charged with two controlled substance offenses, each of which was a "deportable offense," as well as two other potentially "deportable offenses," including assault and petit larceny. At the time of the guilty plea, plea counsel was aware that defendant would have "faced deportation" if defendant had taken his cases to trial and was ultimately convicted on these cases—cases which were described by plea counsel as being "strong," and "difficult . . . to beat." Plea counsel testified that she negotiated the drug treatment pleas "because it . . . would keep him out of jail," which was important given "his green card status," and because defendant needed and "wanted [drug] treatment to help his problem as well as help his mother." Plea counsel stated: "the whole purpose of getting him into the program was to avoid immigration consequences and to avoid a criminal record." According to plea counsel, prior to having the cases referred to QMTC, the People were originally offering a plea disposition which involved a plea to the top charge on one case (assault in the third degree) with three years' probation, and a plea to attempted criminal possession of stolen property in the fifth degree with a conditional discharge. A plea to a violation was not being offered on any of the cases, according to plea counsel.

Following the hearing testimony, defendant and the People filed memoranda of law setting forth their arguments, and otherwise supplementing their prior submissions. Defendant argued that the court should discredit plea counsel's testimony in all respects and that even if the court were to credit defense counsel's claim that she advised defendant of the immigration consequences of failing to complete drug treatment, that advice was constitutionally deficient because defendant remained subject to removal proceedings even if he completed drug treatment and his guilty pleas were vacated. Because defendant's guilty pleas subjected defendant to deportation regardless of whether they were ultimately vacated upon successful completion of treatment, prior plea counsel was constitutionally obliged, according to defendant, to advise defendant regarding the immigration consequences of his guilty pleas. According to defendant, merely advising defendant regarding the immigration consequences of failing to complete treatment was insufficient.

Defendant further argued that his testimony, together with the testimony of his ill mother and prior plea counsel, adequately established that defendant would have insisted on going to trial

and would not have pleaded guilty had he been properly advised regarding the immigration consequences of his guilty pleas.

The People argued that plea counsel's immigration advice was not constitutionally deficient and that, considering all of the circumstances, especially the extremely favorable plea dispositions which counsel obtained on behalf of defendant, plea counsel provided effective assistance of counsel. The People argued that the pleas actually negotiated by plea counsel provided defendant, who faced the possibility of deportation no matter what course of action he pursued given his drug addiction—an independent ground for removal even in the absence of a formal conviction—with the best and most reasonable opportunity to avoid actual deportation.

The People further argued that even if plea counsel's immigration advice was constitutionally deficient, defendant failed to prove that he was prejudiced by the alleged deficiency—namely that there is a reasonable probability that, but for counsel's errors, defendant would not have pleaded guilty and would have insisted on going to trial. This is particularly so, according to the People, given the nature and number of criminal charges pending against defendant and given that the plea bargains offered defendant a conditional alternative to incarceration, a conditionally mandated vacatur of defendant's pleas, and dismissal and sealing of all of the criminal charges. In support of their claims, the People attached several exhibits to their surreply, including a report from ICE, which indicated that ICE makes a concerted effort to identify for deportation criminal "aliens" who are incarcerated in state and local prisons, such as Rikers Island where defendant was in custody.[4]

## Factual Findings and Legal Analysis

Before a criminal defendant decides whether to plead guilty, he is constitutionally entitled to the "effective assistance of competent counsel" (*McMann v Richardson*, 397 US 759, 771 [1970]; *see Strickland v Washington*, 466 US 668, 686 [1984]). In *Strickland*, the Supreme Court set forth a two-part test for

4. (*See* United States Immigration and Customs Enforcement, Criminal Alien Program, http://www.ice.gov/news/library/factsheets/cap.htm). The People also attached to the surreply a New York Times article which described how "the New York Department of Correction routinely gives a list of foreign-born inmates at Rikers Island to immigration authorities, who use it to question, detain and try to deport thousands of them." (*See* Bernstein, *Immigration Officials Often Detain Foreign-Born Rikers Inmates for Deportation*, New York Times, Aug. 25, 2009, at A17.)

assessing claims of ineffective assistance of counsel (*Strickland* at 687).

The first prong of the *Strickland* test requires the defendant to "show that counsel's performance was deficient" and "fell below an objective standard of reasonableness" (*id.* at 687-688), which is "essentially a restatement of attorney competence" (*People v McDonald*, 1 NY3d 109, 113 [2003]). In determining whether an attorney's performance is deficient and falls below an "objective standard of reasonableness" under *Strickland* (466 US at 688), courts should assess counsel's performance against "prevailing professional norms" (*id.*). The second prong of the *Strickland* test, also known as the "prejudice" prong, requires the defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id.* at 694). In the context of an ineffective assistance of counsel claim regarding a guilty plea, however, the prejudice prong more specifically requires the defendant to show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial" (*Hill v Lockhart*, 474 US 52, 59 [1985]; *see also McDonald* at 114).

### *Strickland*'s Constitutional Deficiency Prong

In *Padilla v Kentucky*, the Supreme Court recently applied the deficiency prong of *Strickland*'s ineffective-assistance-of-counsel test to an attorney's advice regarding the immigration consequences of a guilty plea, concluding that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel" in criminal cases because "deportation is [now] . . . intimately related to the criminal process[,] [o]ur law ha[ving] enmeshed criminal convictions and the penalty of deportation for nearly a century" (559 US at —, 130 S Ct at 1481-1482). Defendant Padilla, a lawful permanent resident of the United States, pleaded guilty to felony drug distribution after his attorney had erroneously advised him that "he did not have to worry about [his] immigration status since he had been in the country so long" (*Padilla*, 559 US at —, 130 S Ct at 1478 [internal quotation marks omitted]). This advice was erroneous because the nature of the charge to which defendant pleaded guilty—drug trafficking, an aggravated felony— "made [defendant Padilla's] deportation virtually mandatory" (*id.*).

Because of the "seriousness of deportation as a consequence of a criminal plea," the Supreme Court in *Padilla* held that "counsel must inform her client whether his plea carries a risk

of deportation" (559 US at —, 130 S Ct at 1486). As to defendant Padilla's particular claims, the Court stated that "[t]his is not a hard case in which to find deficiency" (559 US at —, 130 S Ct at 1483), concluding that "constitutionally competent counsel would have advised [Padilla] that his conviction for drug distribution made him subject to automatic deportation" (559 US at —, 130 S Ct at 1478). In setting forth its holding, the Court specifically eschewed the distinction between collateral and direct consequences, as well as the distinction between misadvice and nonadvice (559 US at —, 130 S Ct at 1481-1482, 1484), distinctions which New York courts had routinely applied when reviewing ineffective-assistance-of-counsel claims based upon an attorney's alleged failure to provide advice, or correct advice, regarding the immigration consequences of guilty pleas (see People v Ford, 86 NY2d 397 [1995]; People v McDonald, 1 NY3d 109 [2003]).

Although the Supreme Court held that defendant Padilla was constitutionally entitled to counsel who would specifically advise Padilla that his guilty plea would result in his automatic removal, the Court recognized that "[i]mmigration law can be complex,"[5] and that "[t]here will . . . undoubtedly be numerous situations in which the deportation consequences of a particular

---

5. Although this court readily acknowledges that "[i]mmigration law can be complex" (Padilla, 559 US at —, 130 S Ct at 1483), legal complexity alone should not relieve defense attorneys of their professional responsibility to research and investigate, especially in New York where there are many resources providing expert advice to criminal defense attorneys in the area of immigration law. This court is aware, for example, that "most of the institutional indigent defense providers in New York City, such as the Legal Aid Society, already have a cadre of readily-available, 'in house' experts with whom staff attorneys may consult regarding the potential [immigration] consequences of their clients' guilty pleas" (People v Becker, 9 Misc 3d 720, 727-728 [Crim Ct, Queens County 2005]; see also People v Gatien, 17 AD3d 101, 101 [1st Dept 2005] [counsel's advice on the deportation consequences of defendant's plea was "provided (to defendant) after consultation with experts on immigration law" (emphasis added)]). In addition, the Immigrant Defense Project (IDP) in New York routinely provides expert advice to defense attorneys over the telephone regarding the immigration consequences of various crimes contained in New York's Penal Law. IDP also has a very comprehensive Web site (www.immigrantdefenseproject.org), which criminal defense attorneys can easily access to learn, by use of easy-to-read charts, whether a particular New York Penal Law crime constitutes an "aggravated felony," a "crime involving moral turpitude," or falls within the definition of some "other ground" for deportation, such as a "controlled substance offense" or a "firearm offense." Another extraordinary resource for criminal defense attorneys is the New York State Collateral Consequences Calculator, created by Professor Conrad Johnson and Columbia Law School (see http://calculator.

plea are unclear or uncertain" (*Padilla*, 559 US at —, 130 S Ct at 1483). In these circumstances—that is, in circumstances where the immigration "law is not succinct and straightforward"—counsel's "duty . . . is more limited" and "a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences" (559 US at —, 130 S Ct at 1483).

Here, defendant concededly pleaded guilty to offenses which subjected him to removal—two separate, independent counts of criminal possession of a controlled substance in the seventh degree, each of which alone constitutes a removable offense (*see* 8 USC § 1227 [a] [2] [B] [i]). Defendant also pleaded guilty to one count of assault in the third degree and one count of criminal possession of stolen property in the fifth degree which, taken together as crimes involving moral turpitude, also constitute removable offenses (*see* 8 USC § 1227 [a] [2] [A] [i]).[6] Indeed, defendant here is currently facing removal proceedings based upon the aforementioned guilty pleas.

Unlike defendant Padilla, however, defendant here did not plead guilty to any offenses which would have clearly subjected him to "automatic" or "mandatory" removal or deportation, inasmuch as none of the offenses constituted an "aggravated felony,"[7] defendant having been sentenced to a term of less than one year (*see* 8 USC § 1101 [a] [43]; § 1227 [a] [2] [A] [iii]; *see also INS v St. Cyr*, 533 US at 325 [referring to deportation of aggravated felons as "certain"]; *Zhang v United States*, 506 F3d 162, 167 [2d Cir 2007] ["deportation of aggravated felons is now automatic and non-discretionary"]; *People v Argueta*, 46 AD3d 46, 50 [2d Dept 2007] ["deportation (is) mandatory upon a conviction for an aggravated felony"]). Nor does defendant claim

law.columbia.edu/). A user of the Calculator Web site would have immediate access to the immigration consequence of selected offenses in the New York Penal Law (*see e.g. INS v St. Cyr*, 533 US 289, 323 n 50 [2001] [Court notes that "competent defense counsel, following the *advice of numerous practice guides*, would have advised (his client) concerning the" discretionary nature of a provision of the Immigration and Nationality Act (INA) (emphasis added)]).

6. Although defendant has also moved to vacate his two remaining convictions for criminal trespass in the third degree (two counts), those crimes do not constitute removable offenses, as defendant concedes.

7. Although defendant's guilty plea to criminal possession of stolen property in the fifth degree may have subjected defendant to automatic removal if he had been sentenced to a one-year jail term, defendant was not so sentenced and therefore that charge would not be considered an "aggravated felony" (*see* 8 USC § 1101 [a] [43]).

in any of his submissions that the pleas subjected him to automatic or mandatory removal. On the contrary, defendant's current counsel candidly admitted during oral argument on the motion that defendant, who has been a lawful permanent resident since at least 1996, is eligible for, and currently applying for, "cancellation of removal," during the removal proceedings, which, if granted, would effectively preclude, or "cancel" removal and restore defendant to his status as a legal permanent resident (*see* INA § 240A [a], codified at 8 USC § 1229b [a]).

Under these circumstances, where the removal "consequences of [defendant's] . . . plea[s] [were] unclear or uncertain" (*Padilla*, 559 US at —, 130 S Ct at 1483), plea counsel was constitutionally obliged to "do no more than advise [defendant] that pending criminal charges may carry a risk of adverse immigration consequences" (*id.*). Defendant, of course, claims that his plea attorney did not give him any immigration advice whatsoever prior to his guilty pleas and that therefore plea counsel's representation was constitutionally deficient under *Padilla*. The court, however, fully credits plea counsel's testimony that she specifically advised defendant, sometime prior to defendant entering his first set of guilty pleas in July 2009, that if he failed to complete the drug treatment programs, "he would have a criminal record . . . and he would have immigration consequences."[8]

Thus, the question for the court is whether plea counsel's warning to defendant that if he failed to complete drug treatment, "he would have immigration consequences," is sufficient to satisfy the Sixth Amendment duty imposed upon counsel by *Padilla*. Defendant argues that even if the court were to credit defense counsel's claim that she advised defendant of the immigration consequences of failing to complete drug treatment, that advice was constitutionally deficient because defendant remained removable even if he completed drug treatment and his guilty pleas were vacated, inasmuch as, pursuant to well-

---

8. Indeed, the court finds the testimony of prior plea counsel to be credible in all respects, including her testimony that she was aware of defendant's immigration status as a legal permanent resident. Plea counsel was candid and forthright with the court and was truthful throughout her testimony, even to the point of candidly admitting her only arguable shortcoming, namely, her failure to advise defendant regarding the immigration consequences of pleading guilty (as distinguished from providing advice regarding the immigration consequences of failing to complete treatment). Further, the court declines to credit defendant's testimony that he was never advised of the immigration consequences of failing to complete treatment.

settled immigration law, the vacated guilty pleas would still be considered "convictions" for immigration purposes. Defendant argues that defendant's open guilty pleas subjected defendant to deportation regardless of whether or not he completed treatment, and prior plea counsel was constitutionally obliged to advise defendant regarding the immigration consequences of his actual guilty pleas, whether subsequently vacated or not. According to defendant, merely advising defendant regarding the immigration consequences of failing to complete treatment was insufficient.

It is well settled, as defendant asserts, that for purposes of federal immigration law, a noncitizen's guilty plea to a removable offense may still be considered a "conviction" of a removable offense even though the guilty plea is later vacated on the ground that the defendant has been rehabilitated (*see Saleh v Gonzales*, 495 F3d 17, 24 [2d Cir 2007]). In *Saleh*, the defendant, who had pleaded guilty to a removable offense in California, moved to amend his plea when removal proceedings were commenced against him. The California court granted the motion to amend by vacating defendant Saleh's plea to the removable offense and amending defendant's plea to a nonremovable offense.

Because defendant Saleh's motion and the California court's ruling were specifically designed to help defendant Saleh avoid the adverse immigration consequences of his original plea, the Board of Immigration Appeals (BIA) ruled that defendant Saleh "remained convicted of the original removable offense" (495 F3d at 24). The BIA found that "the amendment to Saleh's judgment of conviction was obtained solely to avoid 'immigration hardships' and not to remedy a procedural or substantive defect in the underlying proceedings" (*id.*). The Second Circuit upheld that determination and cited with approval the determination of numerous other circuit courts which have further ruled that "an alien remains convicted of a removable offense for federal immigration purposes when a state vacates the predicate conviction pursuant to a rehabilitative statute" (*id.* at 25, citing *Pickering v Gonzales*, 465 F3d 263, 266 [6th Cir 2006]; *Alim v Gonzales*, 446 F3d 1239, 1249-1250 [11th Cir 2006]; *Pinho v Gonzales*, 432 F3d 193, 195 [3d Cir 2005]; *Ramos v Gonzales*, 414 F3d 800, 805-806 [7th Cir 2005]; *Cruz-Garza v Ashcroft*, 396 F3d 1125, 1129 [10th Cir 2005]; *Resendiz-Alcaraz v U.S. Attorney Gen.*, 383 F3d 1262, 1268-1271 [11th Cir 2004]; *Murillo-Espinoza v Immigration & Naturalization Serv.*, 261

F3d 771, 774 [9th Cir 2001]; *Herrera-Inirio v Immigration & Naturalization Serv.*, 208 F3d 299, 305 [1st Cir 2000]).

The foregoing immigration law has grave and unforseen consequences for noncitizen defendants who enter drug treatment courts throughout New York State where defendants may routinely enter guilty pleas to removable offenses with the explicit understanding that the pleas would be vacated if the defendant completes a specified drug treatment program. Because such a vacatur would be grounded in defendant's successful "rehabilitation," and not in "any procedural or substantive defect in the original conviction," noncitizen defendants who enter such pleas to removable offenses "remain[ ] convicted of a removable offense for federal immigration purposes" even if the plea is later vacated (*Saleh*, 495 F3d at 25). This is so even where there is no indication that the vacatur was obtained to avoid adverse immigration consequences.

Given the foregoing immigration law, defendant is correct that his pleas to removable offenses placed him in jeopardy of removal even if the pleas were later vacated after he completed the drug treatment program. The ultimate vacatur of his pleas to removable offenses would still be considered "convictions" for immigration purposes. Under these circumstances, the court finds that it would have been better practice for plea counsel here to have specifically advised defendant that his guilty pleas to the removable offenses placed him in jeopardy of removal even if he successfully completed the drug treatment. This critical advice, of course, should be given to any noncitizen defendant who pleads guilty to a removable offense with the understanding that the plea would be vacated after he completes some type of rehabilitation program.

Although the court finds that it would have been better practice for plea counsel here to provide such additional advice, the court declines to find, as urged by defendant, that plea counsel was constitutionally deficient under the performance prong of *Strickland* for concededly failing to give such advice. Significantly, the advice which plea counsel gave to defendant— namely that there would be immigration consequences should defendant fail to complete drug treatment—undeniably placed defendant on notice that his *non*vacated pleas to removable offenses would place defendant at risk of removal. That is the unmistakable import arising from plea counsel's explicit warning. And that advice was not only correct, but it foreshadowed what actually happened here: defendant repeatedly failed to

complete treatment knowing of the immigration consequences thereof and his nonvacated pleas, as expected, placed him at risk of removal.

Defendant's insurmountable problem is the particular facts of his case. He failed to complete treatment and is now reaping the precise consequences about which he was warned by plea counsel. He knew that he risked removal if he failed to complete treatment and he failed to complete treatment nonetheless. Defendant, of course, may have been in a better legal position to argue that plea counsel was deficient, had his guilty pleas been vacated upon his *successful completion* of drug treatment. In that circumstance, he could have reasonably argued that he relied upon the corollary inference arising from counsel's advice—that there would be *no* immigration consequence if he actually completed treatment. Unfortunately for defendant, however, he is not in that circumstance and he cannot reasonably argue that he relied upon plea counsel's advice to his detriment.

Given the particular circumstances of defendant's plea and plea counsel's accurate, albeit incomplete, advice, the court finds that plea counsel satisfied her "more limited" constitutional duty under *Padilla* to "do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences" (*Padilla*, 559 US at —, 130 S Ct at 1483).

Furthermore, plea counsel was not otherwise "deficient" under *Strickland*'s performance prong. On the contrary, plea counsel pursued a very reasonable strategy on behalf of defendant, employing a holistic approach designed to address the array of problems, both legal and social, facing defendant. Plea counsel not only recognized that defendant was charged with crimes which subjected defendant to jail and removal, but also properly recognized that defendant had a very serious drug addiction and was prone to reoffend, given his long-standing drug addiction and given the fact that he already had been arrested four separate times in four months (March to June 2009). Plea counsel's recognition of defendant's long-standing drug addiction and her concomitant exploration of diverting the cases into drug treatment court was wholly consistent with "prevailing professional norms" (*Strickland*, 466 US at 688; *see* ABA Standards for Criminal Justice: Prosecution and Defense Function, standard 4-6.1 [a] ["Whenever the law, nature, and circumstances of the case permit, defense counsel should explore the

possibility of an early diversion of the case from the criminal process through the use of other community agencies"]; *see also* National Legal Aid & Defender Assn, Performance Guidelines for Criminal Defense Representation, guideline 6.2 [b] [1] [C]).

Accordingly, when it became clear to plea counsel that the People were not offering a plea disposition which would have resolved or mitigated defendant's legal and immigration risks, plea counsel properly sought to have defendant enter the QMTC. Pursuant to a written plea agreement in QMTC, defendant's cases, which plea counsel described as "strong," and "difficult . . . to beat," would be dismissed and sealed if defendant completed drug treatment. Such a disposition conditionally guaranteed that defendant would have remained "out of jail"— i.e., Rikers Island—where ICE agents routinely engage in a concerted effort to identify criminal aliens for deportation (*see* United States Immigration and Customs Enforcement, Criminal Alien Program, http://www.ice.gov/news/library/factsheets/ cap.htm; Bernstein, *Immigration Officials Often Detain Foreign-Born Rikers Inmates for Deportation*, New York Times, Aug. 25, 2009, at A17). Such a disposition, of course, would have also helped to resolve defendant's drug addiction, which appeared to be the underlying cause of defendant's re-offending criminal conduct. Overcoming defendant's drug addiction was important because, as the People argued, a noncitizen's drug abuse or drug addiction constitutes an independent ground for removal (*see* 8 USC § 1227 [a] [2] [B] [ii]).

Far from being "deficient," plea counsel's strategy, judged by an "objective standard of reasonableness" (*Strickland* at 688), effectively placed defendant in the best position to avoid actual deportation. Although defendant's guilty pleas to removable offenses, as noted above, subjected defendant to the risk of removal even if the pleas were later vacated (*see Saleh*, 495 F3d at 25), plea counsel's pursuit of a legal strategy which advised defendant to nevertheless take the pleas was reasonable for several reasons.

First, it is important to recognize that defendant was in a "no-win" situation when he appeared in court facing two independent removable offenses (two separate charges of criminal possession of a controlled substance in the seventh degree), as well as several other removable offenses (assault in the third degree, petit larceny and two separate counts of criminal possession of stolen property in the fifth degree), which, taken together, would constitute crimes involving moral turpitude. In

other words, defendant faced the risk of removal no matter what course of action he pursued. Defendant's conviction after trial, for example, would have also subjected defendant to the risk of removal, but without the built-in conditional guarantee of vacatur of the convictions and dismissal and sealing of the underlying cases.

Indeed, in defendant's particular case, he unquestionably would have been placed in greater jeopardy of removal had he been convicted after trial. First, if defendant went to trial and was convicted of petit larceny or criminal possession of stolen property in the fifth degree, such a conviction may be considered an "aggravated felony" as a "theft" offense under federal immigration law if defendant were sentenced to a one-year jail term on either conviction (see 8 USC § 1101 [a] [43] [G]). The foregoing "aggravated felony" designation would render defendant's removal mandatory (see 8 USC § 1227 [a] [2] [A] [iii]; INS v St. Cyr, 533 US at 325), which of course would have placed defendant in greater jeopardy of removal than the guilty pleas actually negotiated by plea counsel. In other words, by pleading guilty defendant placed himself at risk of removal because he pleaded guilty to a "removable offense"; but by insisting upon trial and then being convicted and sentenced to a one-year jail term on any of the aforementioned offenses, defendant would become automatically or mandatorily removable, much like defendant Padilla. Notably, defendant did not set forth any allegations or evidence in his affidavit in support of the motion or in his hearing testimony to demonstrate that he was innocent of the removable offenses, or for that matter, that he had a viable defense to the removable offenses.

Second, it was objectively reasonable for plea counsel to negotiate the plea arrangement in which defendant entered the guilty pleas to removable offenses and agreed to complete treatment (rather than proceed to trial on the "difficult to beat" removable offenses), because that arrangement provided defendant with the best opportunity to seek "cancellation of removal" based upon his prospective rehabilitation, assuming that ICE commenced removal proceedings at all, after somehow learning of the vacated pleas and the dismissed and sealed charges. If defendant were convicted of removable offenses after trial, on the other hand, defendant would have been deprived of the opportunity to assert an important ground for cancellation of removal, namely, rehabilitation. In this respect, pleading guilty and completing treatment—the plea arrangement negoti-

ated by counsel—reduced defendant's risk of removal, as compared to the risk of removal which would have been triggered if defendant insisted upon going to trial and was convicted but not even sentenced to a year in jail.

Third, as the People argue, inasmuch as ICE devotes much of its resources to identifying criminal aliens who are actually already incarcerated, it appears that the risk of removal (or the risk of detection for removal) may be reduced where a noncitizen is able to remain out of jail, as the plea negotiated by plea counsel anticipated. (*See* United States Immigration and Customs Enforcement, Criminal Alien Program http://www.ice.gov/news/library/factsheets/cap.htm; Bernstein, *Immigration Officials Often Detain Foreign-Born Rikers Inmates for Deportation*, New York Times, Aug. 25, 2009, at A17.) In this respect, pleading guilty to removable offenses with the conditional promise of vacatur, nonincarceration, dismissal and sealing clearly provided defendant with a reduced risk of detection by ICE, particularly as compared to the risk of detection by ICE after a trial, conviction and incarceration as a sentenced prisoner.

Under the circumstances, the court finds that defendant has failed to show that plea counsel was "deficient," or that counsel's performance fell below an "objective standard of reasonableness," under the performance prong of *Strickland* (*Strickland* at 688).

### *Strickland*'s Constitutional Prejudice Prong

Even if the court were to find that plea counsel was deficient, vacatur on ineffective assistance of counsel grounds would still not be warranted unless defendant were able to satisfy *Strickland*'s second prong by "affirmatively prov[ing]" prejudice (*Strickland*, 466 US at 693). Because the purpose of the Sixth Amendment's effective assistance of counsel guarantee is to ensure that the defendant has the assistance necessary to "justify reliance on the outcome," a mistake by counsel does not "warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment" (*id.* at 691-692). As a result, to prove prejudice under *Strickland*, a defendant would be required to demonstrate that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id.* at 694).

In *Hill v Lockhart* (474 US 52 [1985]), the Supreme Court applied the *Strickland* prejudice test to cases in which a defendant

accepts a plea bargain prior to trial. In the context of an ineffective-assistance-of-counsel claim regarding a guilty plea, however, the prejudice prong more specifically requires the defendant to show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial" (*id.* at 59; *see also McDonald*, 1 NY3d at 114). The requirement of a showing of prejudice from defendants who seek to challenge their guilty pleas on the ground of ineffective assistance of counsel "serve[s] the fundamental interest in the finality of guilty pleas" (*Hill* at 58).

Although applying *Strickland*'s/*Hill*'s prejudice prong to particular cases—determining the probability that a particular defendant would have insisted upon going to trial—"may pose a difficulty in some cases" (*United States v Horne*, 987 F2d 833, 835 [DC Cir 1993]), at a minimum it is clear that self-serving, conclusory and unsupported statements that a defendant would not have pleaded guilty and would have insisted on going to trial are insufficient to establish prejudice (*see Yong Wong Park v United States*, 222 Fed Appx 82, 84 [2d Cir 2007] [petitioner's "self-serving statements are insufficient to establish prejudice"]; *United States v LaBonte*, 70 F3d 1396, 1413 [1st Cir 1995] [defendant's "self-serving statement that, but for his counsel's inadequate advice he would have pleaded not guilty, unaccompanied by either a claim of innocence or the articulation of any plausible defense that he could have raised had he opted for a trial, is insufficient to demonstrate prejudice"]; *United States v Horne*, 987 F2d at 836 [to establish prejudice "a defendant must make more than a bare allegation that he 'would have pleaded differently and gone to trial' "]; *Boakye v United States*, 2010 WL 1645055, *6, 2010 US Dist LEXIS 39720, *16 [SD NY 2010] ["(t)he conclusory claim in (p)etitioner's brief that he would have gone to trial but for counsel's alleged ineffectiveness, standing alone, does not establish prejudice under *Strickland*"]).

Here, defendant claims that he would not have pleaded guilty and would have insisted upon going to trial had plea counsel properly and fully advised defendant of the immigration consequences of pleading guilty. In support of that claim, defendant alleges that he came to the United States as a Romanian refugee when he was only 12 years old and later became a lawful permanent resident in 1996, remaining in the United States for 21 years. Defendant also claims that he would have never pleaded guilty had he known that he could be deported because

he has no home or family in Romania and all of his family members are in New York, including his mother who is seriously ill and has a three-year life expectancy.

Although the court fully understands defendant's desire to remain in the United States with his ill mother, the court declines to credit defendant's self-serving claim that he would not have pleaded guilty and would have insisted upon going to trial had plea counsel properly and fully advised defendant of the immigration consequences of pleading guilty. Defendant's claim is belied by the fact that defendant was perfectly willing to risk deportation (and seven months' jail, along with a criminal record) when he repeatedly absconded from the drug treatment programs with full knowledge that the absconding would most certainly result in adverse immigration consequences. This fact, evincing as it does a reckless disregard for his immigration status, is the most telling and crucial piece of evidence for the court on the question of what defendant would have done had he been properly advised regarding the immigration consequences of his guilty pleas (*see People v McKenzie*, 4 AD3d 437, 440 [2d Dept 2004] [defendant's decision to plead guilty even though he knew that there was a *"possibility"* of his deportation "raises the question of whether defendant truly was prejudiced by counsel's" failure to explain to defendant that he was "automatically deportable"]).

Furthermore, defendant's claim of prejudice is unsupported by, and otherwise largely inconsistent with, his own hearing testimony. First, when defendant was repeatedly asked on direct and cross-examination what he would have done differently had he known of the immigration consequences of his plea, defendant simply responded that he would have urged counsel to find a more favorable plea. This, of course, is insufficient to establish prejudice (*see Gargano v United States*, 852 F2d 886, 891 [7th Cir 1988] [defendant "does not suggest that he is not guilty. He only suggests that he should have had the opportunity to strike a harder bargain with the government. This is not enough to establish prejudice"]). Indeed, defendant's current counsel completed his direct examination of defendant without defendant ever having testified that he would have refused to plead guilty and would have insisted upon going to trial had he been properly advised regarding the immigration consequences of his plea.

When defendant was then asked if he would have done anything else differently if a more favorable plea were not an

option, defendant testified that he would have taken his drug treatment program more seriously. Defendant repeated this testimony when the court, in its own questioning, then gave defendant an opportunity to clarify his testimony. When the People then pointedly asked defendant whether he had previously testified that he "would have gone to trial" had he been properly advised regarding the possibility of deportation, defendant plainly answered, "No." Again, the foregoing testimony is inconsistent with defendant's current claim that he would not have pleaded guilty had he known of the adverse immigration consequences of his guilty pleas.

The court is aware that on redirect examination, defendant, steeped in the reality of imminent removal, ultimately testified that he "would not" have pleaded guilty had he known that "he may be thrown out of this country and not be able to return." That answer, however, was completely undermined by the preceding portions of defendant's testimony and otherwise does not weigh heavily with the court, given that it was elicited with the strong prompting of a leading question. Defendant's actions in this case—his repeated failure to complete treatment knowing full well that there would be adverse immigration consequences—speak much louder than his single answer to a leading question.

The leading nature of the questioning aside, the question itself posed an unfair and incomplete choice for defendant. The more appropriate question for the court is: what would defendant have done, what choice would defendant have made, had plea counsel properly and fully advised defendant regarding the immigration risks of each of the options (plea versus trial) available to defendant. It is, for example, very easy for defendant, who is currently in ICE's custody facing imminent removal proceedings, to allege that he would not have pleaded guilty had he known that the guilty plea would place him in jeopardy of removal. Such an allegation, however, fails to adequately recognize the fact that insisting upon going to trial likewise would have placed the defendant in jeopardy of removal—perhaps in greater jeopardy than the jeopardy defendant faced by pleading guilty (*see Park*, 222 Fed Appx at 84 [petitioner failed to demonstrate prejudice where evidence of guilt was strong, and where the guilty plea and a conviction after trial "would trigger the same deportation consequences"]; *see also Hill* at 60 [petitioner's "mistaken belief (regarding the duration of his parole) would seem to have affected not only his calculation of the time

he likely would serve if sentenced pursuant to the proposed plea agreement, but also his calculation of the time he likely would serve if he went to trial and were convicted"]).

Accordingly, when the court, carrying out its prejudice inquiry pursuant to *Strickland/Hill*, attempts to decide whether there is a reasonable probability that defendant would have insisted upon going to trial, the court should consider what immigration risks would be triggered by a conviction after trial as well. In this respect, a more appropriately framed prejudice inquiry—one which properly accounts for the range of pretrial options available to defendant—would ask whether there is a reasonable probability that defendant would not have pleaded guilty and would have insisted upon going to trial had defendant been fully advised *not only* of the adverse immigration consequences of his guilty pleas *but also the adverse immigration consequences of insisting upon going to trial*. In this court's view, this inquiry will be very helpful in resolving the "difficulty" "pose[d]" (*United States v Horne*, 987 F2d at 835) by *Strickland*'s prejudice prong.

Here, if defendant were fully informed regarding the immigration risks of each of the options available to defendant (plea versus trial), defendant would have learned that insisting upon going to trial would likely place him at greater risk of removal than pleading guilty in QMTC. This is because pleading guilty and entering drug treatment (a) guaranteed that defendant would avert an otherwise possible aggravated felony designation, which would result in automatic removal; (b) presented defendant with the opportunity to seek cancellation of removal based upon rehabilitation; and (c) reduced the risk of ICE detection of defendant inasmuch as defendant would have remained out of jail. (*See* decision herein at 737, 738.)

It is true that by insisting on going to trial, defendant may have been found not guilty on each of the six removable offenses charged in the four prosecutions. This possibility is remote and speculative, however, inasmuch as defendant has completely failed to claim that he is not guilty of the offenses to which he pleaded guilty, and otherwise failed to set forth viable defenses to those offenses (*see United States v LaBonte*, 70 F3d at 1413 [to demonstrate prejudice defendant should set forth "either a claim of innocence or the articulation of any plausible defense that he could have raised had he opted for a trial"]; *United States v Horne*, 987 F2d at 836 [defendant failed to demonstrate prejudice under *Strickland/Hill* where defendant "has offered

nothing to suggest that he would have succeeded if he had gone to trial," "nor claimed to have any defense to the charges to which he pled guilty"]; *Czere v Butler*, 833 F2d 59, 64 [5th Cir 1987] [a defendant fails to establish prejudice under *Hill* when he "does not maintain . . . that he is innocent of the charges in the indictment, or that a plausible defense to those charges exist(s)" (internal quotation marks and citations omitted)]; *People v Bao Lin Xue*, 30 AD3d 166, 167 [1st Dept 2006] ["given the overwhelming strength of the People's case . . . there is no reasonable probability that defendant would have insisted on going to trial but for counsel's" alleged misadvice regarding immigration consequences]; *People v Hayes*, 186 AD2d 268, 269 [2d Dept 1992] [defendant fails to demonstrate prejudice under *Strickland/Hill* where, inter alia, "defendant does not allege that he is actually innocent of the charges to which he voluntarily pleaded guilty"]; *see also Padilla*, 559 US at — n 12, 130 S Ct at 1485 n 12 ["it is often quite difficult for petitioners who have acknowledged their guilt to satisfy *Strickland*'s prejudice prong"]).

In any event, even if defendant were found not guilty of the removable offenses, defendant would have technically remained at risk of removal because his long-standing drug addiction constituted an independent ground for removal (*see* 8 USC § 1227 [a] [2] [B] [ii]).

Nor did defendant set forth any particular "special circumstance[ ] that might support the conclusion that he placed particular emphasis on [the immigration consequences] in deciding whether or not to plead guilty" (*Hill*, 474 US at 60; *see e.g. People v Garcia*, 29 Misc 3d 756, 760 n 5 [Sup Ct, Kings County 2010] [prejudice found where, prior to pleading guilty, defendant diligently sought to ascertain whether the proffered plea placed him at risk of deportation and the "plea proceeding itself (demonstrated) that a primary concern of defendant was the immigration issue"]; *People v Williams*, 72 AD3d 1347, 1348 [3d Dept 2010] [prejudice hearing ordered where affidavit demonstrated "that defendant repeatedly expressed reservations about pleading guilty if such a plea might lead him to being deported"]; *United States v Kwan*, 407 F3d 1005, 1017 [9th Cir 2005] [prejudice found where defendant "asked counsel about the immigration consequences of pleading guilty before agreeing to do so" and otherwise went to "great lengths to avoid deportation and separation from his" family]; *United States v Couto*, 311 F3d 179, 188 n 9 [2d Cir

2002] [prejudice found where "(d)efendant's whole behavior—including her alleged crime—was designed to avoid deportation"]).

Under all of the circumstances, including the court's credibility findings, this court finds that defendant failed to demonstrate "that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial" (*Hill* at 59).

Accordingly, defendant's motion to vacate his guilty pleas is hereby denied.